OPINION
 

 By the Court,
 

 Leavitt, J.:
 

 While appellant was playing a slot machine, an internal malfunction suspended the game, abruptly stopping the reels. The reels stopped with three jackpot symbols appearing in an uneven line across the pay line. The internal error was cleared, causing the game to reset, and a non-winning combination appeared on the reels after play resumed. The Nevada Gaming Control Board agent dispatched to the scene conducted an investigation and concluded that appellant did not have a valid win because of the malfunction and the uneven alignment of the jackpot symbols. Appellant petitioned the Nevada Gaming Control Board for reconsideration and the Board affirmed the agent’s decision. Appellant petitioned the district court for judicial review and the district court dismissed the petition, affirming the Board’s decision.
 

 We affirm the district court’s judgment upholding the Board’s decision, because the decision was supported by adequate evidence and was not arbitrary or capricious or otherwise contrary to law.
 

 FACTS
 

 On September 21, 1996, appellant Cengiz Sengel was playing an IGT Quartermania Triple Diamond slot machine at the Silver Legacy Casino in Reno, Nevada. The IGT slot machine was part of a statewide, progressive jackpot system of inter-linked slot machines. Sengel placed two quarters, the required number to play for the progressive jackpot, into the machine and initiated a play. The progressive jackpot amount at the time of the play was approximately $1,797,000, to be awarded for an alignment of three Quartermania symbols across the sole pay line.
 

 
 *568
 
 The slot machine malfunctioned when the microswitch on the cash door of the bill validator reported to the machine’s internal monitoring system that the cash door was open. This malfunction caused the slot machine to immediately suspend play: (1) the reels abruptly stopped spinning with three Quartermania jackpot symbols appearing in an uneven line across the pay line; (2) a tilt code appeared in the “winner paid” window; (3) the light on top of the machine flashed a maintenance signal; (4) the progressive jackpot amount did not stop; (5) no sirens or music came from the slot machine; and (6) no jackpot win registered on the interlinked computer system.
 

 Sengel claimed a jackpot win, but the casino’s slot shift manager concluded that there was not a valid win because of the apparent malfunction and the misalignment of the symbols. Sengel disagreed with the shift manager, who immediately contacted the Nevada Gaming Control Board (hereafter “Board”) and the slot machine manufacturer, IGT. Board agent Robert Johnson arrived at the Silver Legacy and conducted a thorough investigation of the dispute.
 

 The tilt error code was cleared by a casino employee, through a manual adjustment of the microswitch on the cash door, and the game was reset. As soon as the game reset, play resumed and a non-winning combination, three blanks, appeared on the slot machine. The Board agent performed several tests on the machine and verified that Sengel did not have a valid jackpot. The agent concluded his investigation and sent a letter to Sengel, stating that there was not a valid win because the game had been suspended due to a malfunction and when the game was completed the result was a non-winning alignment.
 

 Sengel filed a petition for reconsideration with the Board. A two-day hearing was held before a Board hearing examiner, who concluded that Sengel had not demonstrated by a preponderance of evidence that the Board agent’s decision should be modified or reversed and recommended that the Board affirm the agent’s decision. The Board subsequently accepted that recommendation and affirmed the denial of the jackpot.
 

 Sengel filed a petition for judicial review with the district court. After a hearing, the district court dismissed the petition and affirmed the Board. This appeal followed.
 

 DISCUSSION
 

 The Nevada Gaming Control Board has exclusive jurisdiction to resolve a disputed claim, such as Sengel’s, by a patron of a gaming licensee for payment of a gambling debt that is not evidenced by a credit instrument. NRS 463.361(2)(a).
 
 [1]
 
 No other remedy
 
 *569
 
 exists to enforce a gaming debt not evidenced by a credit instrument. NRS 463.361(1). Once the Board resolves such a gaming dispute, any person aggrieved by the Board’s decision may obtain judicial review of the Board’s decision, subject to the following limitations on judicial review:
 

 The reviewing court may affirm the decision and order of the board or the hearing examiner, or it may remand the case for further proceedings or reverse the decision if the substantial rights of the petitioner have been prejudiced because the decision is:
 

 (a) In violation of constitutional provisions;
 

 (b) In excess of the statutory authority or jurisdiction of the board or the hearing examiner;
 

 (c) Made upon unlawful procedure;
 

 (d) Unsupported by any evidence; or
 

 (e) Arbitrary or capricious or otherwise not in accordance with law.
 

 NRS 463.3666(3).
 

 I.
 
 Decision supported by “any” evidence
 

 Sengel implicitly argues that reversal of the Board is justified under NRS 463.3666(3)(d) because the Board’s decision is not supported by any evidence. Sengel states that there are no disputed facts, yet consistently recasts the factual findings of the Board throughout his argument. Therefore, we will address the issue as though raised explicitly.
 

 The district court exhibited some confusion as to whether the “any” evidence or the “substantial” evidence standard applied. The district court stated that because there was “overwhelming” evidence supporting the Board’s decision, there was enough evidence to affirm the Board under either standard. After reviewing the record, we agree that the Board’s decision was supported by both “substantial” evidence and “any” evidence, although the district court should have conducted its review under the “any”
 

 
 *570
 
 evidence standard. NRS 463.3666(3)(d). Because the district court arrived at the correct decision, even though based on the wrong standard, we affirm that decision.
 
 See
 
 Hotel Riviera, Inc. v. Torres, 97 Nev. 399, 403, 632 P.2d 1155, 1158 (1981) (holding that a correct decision of a district court will be affirmed, even if based on the wrong reason).
 

 In order to give clear direction to the lower courts and prevent the application of the wrong standard in the future, primarily in cases with less than substantial evidence in which using the wrong standard could make a difference, we take this opportunity to clarify that the “any” evidence standard applies. NRS 463.3666(3)(d) uses the word “any” instead of “substantial,” indicating that a reviewing court should affirm a decision of the Board which is supported by
 
 any evidence whatsoever,
 
 even if that evidence is less than “that which ‘ “a reasonable mind might accept as adequate to support a conclusion.” ’ ” City of Las Vegas v. Laughlin, 111 Nev. 557, 558, 893 P.2d 383, 384 (1995) (defining the “substantial” evidence standard) (quoting State, Emp. Security v. Hilton Hotels, 102 Nev. 606, 608, 729 P.2d 497, 498 (1986) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971))). This comports with the “great deference” we afford a decision of the Board on appeal.
 
 See
 
 Redmer v. Barbary Coast Hotel & Casino, 110 Nev. 374, 378, 872 P.2d 341, 344 (1994).
 

 With this standard in mind, we examine Sengel’s contentions.
 

 Sengel contends that the slot machine did not malfunction because it acted exactly as it was designed to operate. By stopping abruptly upon receiving an error code, the machine produced a result on the reels in a manner in which it was designed. Because, argues Sengel, the reels were stopped in a manner in which they were designed to be stopped, the result was not a malfunction.
 

 However, the Board heard evidence that the slot machine was only designed to produce jackpots via the random number generator. It was not designed to produce a final game result with the sudden stoppage of the reels caused by an error code. Any result shown on the reels during suspension of the game was designed to be just that: a suspended result. Upon a reel shutdown caused by a tilt code, the machine was not designed to recognize the suspended result as a legitimate outcome, be it an apparent winning or non-winning alignment. Respondents’ witnesses testified that, while the game did do what it was designed to do, which is to immediately shut down upon detection of an error code, the game was not designed to produce a final play alignment of the reels until after the error code was cleared. Sengel’s own expert witness admitted on cross-examination that a door tilt code would
 
 *571
 
 have to be considered a malfunction. Further, the Board took evidence from Board agent Robert Johnson that the machine itself showed a malfunction code and in other ways visually appeared to not have a valid jackpot. The abrupt stop of the reels, the uneven alignment of the jackpot symbols, the tilt code in the “winner paid” window, the maintenance light on top of the machine and the absence of jackpot lights, the continued running of the progressive jackpot amount, the lack of sirens or music coming from the slot machine, and the fact that no jackpot win registered on the inter-linked computer system all support the Board’s finding that a malfunction occurred. Accordingly, Sengel’s argument is without merit, because there is evidence to support a finding that a malfunction occurred.
 

 Sengel challenges the Board’s finding that the malfunction was part of the slot machine, not part of associated equipment. He argues that the slot machine itself is a “gaming device,” as defined in NRS 463.0155, but that the bill validator is merely “associated equipment,” as defined in NRS 463.0136. Sengel argues that some Quartermania slot machines have bill validators and some do not, so the bill validator is not an essential part of the actual gaming device. The Board, however, with its expertise in gaming matters, found that the bill validator, once placed inside the slot machine and connected with the machine’s unified security system and part of the computerized “game flow” process, is part of the slot machine and not merely associated equipment. Because there is evidence supporting this finding, we again defer to the Board.
 

 II.
 
 Decision not arbitrary, capricious or contrary to law
 

 “An order of the Nevada Gaming Control Board will not be disturbed unless it is arbitrary, capricious or contrary to the law. Yet in spite of this standard, this court is free to examine purely legal questions decided at the administrative level.”
 
 Redmer,
 
 110 Nev. at 378, 872 P.2d at 344 (citations omitted). “This court’s role in reviewing an administrative decision is identical to that of the district court.” Nevada State Bd. of Nursing v. Merkley, 113 Nev. 659, 664, 940 P.2d 144, 147 (1997).
 

 Even alignment required by pay table
 

 The slot machine had a pay table which listed the possible winning alignments and their respective payoff amounts. The Board found that this pay table clearly showed an even alignment of jackpot symbols next to the progressive jackpot amount, and Sengel does not dispute this finding. The Board concluded from this finding that the even alignment of the symbols on the pay table was an express term of the wagering contract entered into between the
 
 *572
 
 parties. However, Sengel argues that the exact horizontal alignment of symbols on the pay table is merely for efficiency and aesthetics, and is not a binding term of the contract. However, no evidence in the record supports this claim. With no evidence to the contrary, the Board was justified in concluding that an even alignment of jackpot symbols was a term of the contract expressly stated on the face of the machine in the pay table.
 

 Notice of random number generator
 

 Sengel characterizes one basis of the Board’s decision as follows: any result on the pay line not produced by the random number generator is void and therefore the reels themselves are irrelevant to the game. Sengel labels this reasoning as the Board’s secret policy, which allows it to arbitrarily and capriciously deny valid jackpots at will, a secret policy whereby a visual jackpot that is not generated by a random number generator is not a valid jackpot. Sengel argues that because the public is not given notice that jackpots not generated by a random number generator are invalid, the Board’s implementation of this policy without public notice is arbitrary or capricious or otherwise contrary to law.
 
 [2]
 
 Sengel correctly points out that Nevada statutory and case law provide that a malfunction voids the play of a slot machine, provided the slot machine has a statement to that effect. He argues that if a new kind of malfunction, the kind that can merely
 
 suspend
 
 play for a time rather than void a play, is to be recognized by the Board, it is only fair that such a statement also be included on the face of the machine. He argues that it is arbitrary or capricious or contrary to law for the Board simply to recognize this new kind of malfunction without first requiring notification to the public on the face of the machine.
 

 Sengel’s argument fails for three reasons. First, Nevada Gaming Commission Regulation 14.040(2) requires that all gaming devices “[m]ust use a random selection process to determine the game outcome of each play of a game.” Because the public has constructive knowledge of this regulation, which is state law, Sengel had constructive knowledge when he played the machine that the game result was to be determined by a “random selection process,” and that any result or apparent result caused by any
 
 *573
 
 other means would be invalid.
 
 See
 
 Smith v. State, 38 Nev. 477, 481, 151 P. 512, 513 (1915) (stating that “[e]very one is presumed to know the law, and this presumption is not even rebut-table”). Because of this constructive knowledge, Sengel’s lack of notice argument fails. Second, even if the malfunction alignment was the final alignment and not the result of a malfunction, it is not a valid jackpot that is otherwise being denied arbitrarily. The Board found that the uneven alignment of the Quartermania symbols did not constitute a jackpot? even if that alignment had not been caused by a malfunction. Third, the statement on the face of the machine, “Malfunction voids all pays and plays,” was sufficient to include the type of malfunction which occurred in this case.
 

 Rules of play
 

 Next, Sengel contends that the Board’s denial of the jackpot is arbitrary and capricious because it violates the “rules of play” associated with slot machine play. However, he cites no legal authority to support his rules of play and instead claims that the rules of play have ‘ ‘been in effect for so long, are used so often, and are so widely known that it is difficult to find them cited as such in any one place.”
 
 [3]
 
 We need not consider this argument because Sengel cites no legal authority to support it.
 
 See
 
 Cunningham v. State, 94 Nev. 128, 130, 575 P.2d 936, 938 (1978).
 

 Alignment anywhere on pay line
 

 Finally, Sengel argues that the language on the machine, “On payline with two quarters in wins progressive,” only requires that the symbols need be
 
 anywhere
 
 on the pay line, not perfectly aligned with the other symbols and not necessarily bisected by the pay line. The only evidence in support of this proposition is the testimony of Sengel’s expert witness, a former slot manager who retired twenty years ago. The expert opined that the malfunction alignment was a winning alignment because all the symbols were cut somewhere by the pay line. He stated that a jackpot symbol is a winning symbol if it stops
 
 anywhere
 
 on the pay line, regardless of whether it is aligned with the other symbols. The Board, however, was free to discount the expert’s testimony because he had been out of the gaming industry for twenty years. The Board was free to give more weight to an express term on the face of the slot
 
 *574
 
 machine, the picture on the pay table showing an even alignment of jackpot symbols, than to the opinion of a retired casino manager. There was evidence on the pay table located on the face of the machine that the symbols had to be evenly aligned and there was evidence that the symbols were in fact not in the even alignment shown on the pay table. Accordingly, the Board’s conclusion that Sengel did not have a valid win was not arbitrary or capricious or contrary to law.
 

 In closing, we note that both parties have advanced public policy arguments in support of their positions. While we appreciate the tension between these and other competing public policies, it is not this court’s role to dictate public policy in gaming. The State Legislature, in enacting the legislative scheme of which NRS 463.3666 is a part, has empowered the Nevada Gaming Control Board, not this court, to make these policy decisions.
 

 CONCLUSION
 

 This court shows great deference to a decision of the Nevada Gaming Control Board. Because the Board’s decision was not unsupported by any evidence and was not arbitrary or capricious or otherwise contrary to law, we affirm the order of the district court upholding the Board’s decision.
 
 [4]
 

 Maupin, Shearing and Becker, JJ., concur, and Zenoff, Sr. J., concurs in result only.
 

 [1]
 

 NRS 463.361 provides, as follows:
 

 1. Except as otherwise provided in NRS 463.361 to 463.366, inclu
 
 *569
 
 sive, gaming debts that are not evidenced by a credit instrument are void and unenforceable and do not give rise to any administrative or civil cause of action.
 

 2. A claim by a patron of a licensee for payment of a gaming debt that is not evidenced by a credit instrument may be resolved in accordance with NRS 463.362 to 463.366, inclusive:
 

 (a) By the board; or
 

 (b) If the claim is for less than $500, by a hearing examiner designated by the board.
 

 NRS 463.0171 defines a “licensee” as “any person to whom a valid gaming license, manufacturer’s or distributor’s license . . . has been issued.” Respondents meet this definition.
 

 [2]
 

 Appellant makes this argument in conjunction with a novel promissory estoppel argument. He argues that because respondents present the Quartermania slot machine to the public as a traditional reel-type machine, with payouts dependent only on the position of the reels and not dependent on a hidden random number generator inside the machine, the respondents are estopped from conditioning a jackpot on the results of the random number generator. We conclude that this argument lacks merit.
 

 [3]
 

 Appellant further states that the decisions of the Board and district court “seem to presume” the existence of the rules of play, without elaborating why. Appellant also requests this court to take judicial notice of his rules of play, without citing any determinative legal or non-legal authority in support of his request. We decline to do so.
 

 [4]
 

 The Honorable David Zenoff, Senior Justice, was appointed by the court to sit in place of The Honorable Deborah Agosti, Justice. Nev. Const. art. 6, § 19; SCR 10.
 

 The Honorable Robert Rose, Chief Justice, and The Honorable Cliff Young, Justice, voluntarily recused themselves from participation in the decision of this appeal.